Ladies and gentlemen, our first case for argument is Motorola v. AU Optronics and others. Mr. Goldstein. Good morning, Your Honors, and may it please the Court, my name is Tom Goldstein. I represent Motorola Mobility, the parent corporation, and I reserve four minutes for rebuttal. I'd like to focus on our argument that the defendant's Category 2 sales, that is, the sale of LCD panels to be incorporated into phones to be imported into the United States, satisfies the FTAIA's direct effects exception. And the effect that we're talking about here is the increased price that the parent corporation paid in the course of importing the phones. Mr. Goldstein, forgive me for interrupting, but I have a sort of bottom line question, or I think it's a bottom line question, and it's this. Aren't you attempting here to claim the benefits of setting up foreign subsidiaries and thus avoiding the United States laws that do not suit you, but then claiming that the status as a foreign subsidiary is irrelevant when you want the benefit of the United States laws? And that is what has been troubling me, and truly, if you can help me with that, I will be very grateful. Absolutely, Your Honor. We are not doing that on a number of different levels. So, for example, we repatriate all of the profits. These are regarded, for example, principally as check-the-box entities. They get all of U.S. tax treatment. We were required to set up foreign subsidiaries by local law in order to be able to operate in these countries. The question, I think, for you is, you're interpreting the federal antitrust laws, and what you have to decide is, look, Motorola made the choice here, even if driven by foreign law, to set up these subsidiaries. Is that a difference Congress would think makes a dispositive difference in the antitrust laws? Is it something that governs why it is the antitrust laws would apply to this transaction? Are you saying the subsidiaries pay American taxes? The subsidiaries do not. Motorola pays U.S. taxes on their profits. The profits are repatriated to the United States. So why does that make a difference? All I was trying to do was... What I don't understand. The taxes are paid abroad. The profits of those companies are recorded as profits of... No, wait a second. Sorry? The subsidiaries pay income tax in their countries in which they're incorporated? They follow all domestic tax laws, for sure. Motorola then takes their profits as income, and that income is taxable in the United States. Yes, but they're not paying the income tax on these foreign subsidiaries' profits. Well, Your Honor, to the extent that the foreign... Are they? The foreign subsidiary pays an income tax. Motorola doesn't pay that income tax. Motorola is, of course, the parent. To the extent the subsidiaries themselves have... Does Motorola pay the income tax on these foreign subsidiaries, or are they taxed by their country of incorporation? They are taxed locally. They are taxed locally. Well, why do you say, then, that you, Motorola, purchased over $5 billion worth of LCD panels from cartel members? You purchased from your foreign subsidiaries. That's correct. They purchased from the alleged cartelists. The reason we say is that... Your Honor... So, for tax purposes, you treat them as separate corporations. For antitrust purposes, you want to treat them as all part of Motorola. Well, you ask two questions. The first one is, why did we say it that way? The reason that we said it that way is that we control the transit. No, that's not my question. I'm sorry, what is the first question? My question is, is that a correct description of what you do? With the addendum, yes, with the addendum, that when the subsidiaries have profits, those profits are repatriated to the parent and we pay taxes on that, but with only that addendum. Fundamentally, we do not think the tax structure of the organization, which I was just using to illustrate that we're not just trying to have it both ways, is not... No, you are trying to have it both ways because you want the tax benefits of foreign taxation, which so many American corporations want, but you want, for antitrust purposes, to treat these foreign subsidiaries as if they were not subsidiaries incorporated in a foreign country, but divisions of Motorola. Okay, so the reason that we disagree, for example, is that... Well, is that correct? Is that what you're doing? You... Is that what you're doing? That is not the purpose of what we are doing. It is the case... But that is what you are doing. You are getting tax benefits by treating these foreign companies as foreign companies, which they are, but you are seeking an antitrust benefit from treating them as you, right? I actually don't think that that's correct, so for the following reason. Assume that there weren't subsidiaries. If Motorola was operating in China and Singapore, I think there's every reason to believe that we would have to pay local taxation there. The fact that they're a subsidiary doesn't immunize us from local taxation where we have factories. The structure of the organization doesn't relate to tax. Why did you form foreign subsidiaries? Because we're required by local law. A lot of these countries... Because you're a part of... Required by local law. In a lot of these countries, you just can't have the U.S. company open up a factory there. You're required to create a local corporation. And you're perfectly content with that. The question is whether you can benefit by treating these subsidiaries as foreign companies, benefit in tax, but then get an advantage in antitrust. Okay, then let's focus on that question. I think the answer is yes, even if you were to take all of the tax structure and use it as a factor against us. And the reason is that the U.S. antitrust laws aren't concerned with tax structure and tax advantage. They are concerned with, as the statute indicates, with whether there is a direct effect on the U.S. economy. But we're concerned with foreign shopping. So these foreign subsidiaries could sue under local antitrust law. That's not... But you prefer American antitrust law. Okay, Your Honor... So you like their tax, you like them paying local taxes, but you want to have them taking advantage of American antitrust law. Your Honor, I'll return to the same example for the reason that I think that's not correct. Assume these weren't subsidiaries. Assume that Motorola had the factories in the local countries. We would still have the identical rights to sue under local law. The corporate structure has nothing to do with your point, and that is there may be local remedies. In these cases, there aren't, as it happens. But the fact that we create a subsidiary... Why aren't there local remedies? Because we're concerned here principally with Singapore and China. China only created a private right of action, which we think has never been... Well, now you have, am I correct, you have ten foreign subsidiaries? I believe that's correct. Now, how many of them purchase from the alleged cartel? All of them. All of the functioning subsidiaries that engage in purchases for the creation of phones because the cartel was all... And you're not saying that none of them have antitrust remedies under local law. I'm not saying that none of them have antitrust remedies, just as I am not saying if it was just Motorola purchasing that none of them would have antitrust remedies, Your Honor. Again, whether they're subsidiaries or not is orthogonal to the question of whether they have foreign remedies. And it has always, of course, been the case that with respect to cartels, you were going to have the opportunity to have foreign remedies so long as you were interacting with a foreign party. But what Alcoa and Hartford Fire teach is that in the area of antitrust law, it is commonplace for there to be overlapping and duplicative remedies. What Congress looked to is whether there was a direct, substantial, and reasonably foreseeable effect in the United States. And that is the trigger for our exercise... What's the limiting principle here? How indirect an injury would be sufficient? Yes, here is the limiting principle. Under the direct effects exception, this court said in MNCHEM it has to be reasonably proximate. So we do not believe it is sufficient merely that there was the sale of screens to be incorporated into phones to come into the United States. This injury and this effect is reasonably proximate for two reasons. The first is that the defendants worked directly with the importer. That is to say, they worked with Motorola to set the prices to design the LCD screens and the phones. That's what we want to prove and why summary judgment is inappropriate here. So that's point one. And if I could just mention the second. Sure, sure. The second is there is no independent intervening economic actor. A critical notion in proximate cause is, look, is there some other... Well, that's Motorola. That is, the foreign subsidiaries pay the alleged cartel price, then they turn around and sell to Motorola. That's correct, but my point is this. When the subsidiaries purchase the phones, they do it at Motorola's direction at a price that is set through negotiations with Motorola, not the subsidiary. But here for category two, at least, the injury occurs only after the components are used in cell phones that have made their way to the United States. What I am wondering is why isn't that too far removed from the initial illegality to support a cause of action? Sure. So, again, stepping back from the limiting principle, and just to be clear, what we think the limiting principle does is distinguish this case from a situation where the defendants sell to some manufacturer that creates phones that happen to make their way into the United States. We think it's critical that the defendants were working with the importer itself. Now, you ask, isn't there nonetheless a separate step? And that is we have the sale of screens that get incorporated into phones and those phones that get incorporated. And when this court first considered this case, it regarded that as indirect. We think that what MINCAM teaches is that, look, there is import commerce. That would be category one. That is the actual importation of the screens themselves. And the direct effects exception is one step removed from that and asks, is it reasonably proximate? Our point is this. When the defendants negotiate with the parent corporation, the importer, when it's the importer that makes the decision, that is reasonably proximate. The importer made all the decisions about the purchases of the screens by the subsidiaries. It would not... When you say the importer, you mean Motorola? Yes. Motorola is the importer. Motorola is... The court has made the point that you're going to have to take the bidder with a sweet. You're going to have to regard these as two separate corporations. We say, okay. So I am focused here on... But this would be true even if Motorola were buying from foreign companies, the cartel's customers who were not Motorola's subsidiaries. That is not correct. That's the limiting principle. My point is this. I don't understand the relevance of there being subsidiaries rather than separate companies. And here is the relevance. And that is when we control them, when we tell the subsidiaries, here's what you're going to buy, at what price, when, you don't have an intervening economic decision maker. That is some third-party manufacturer. And that's what makes it proximate. They know, and it is a direct effect that is coming... And, of course, on that logic, the shareholders of Motorola could sue. I don't think so, Your Honor. Because they control Motorola and, therefore, the foreign subsidiaries. Well, a historic, you know, the historic approach to proximate cause has not been that. And that is when they come to Motorola, when they negotiate with us to set the price, that becomes the cartel price. When they negotiate with us to design the LCD screens, that is the parent company controlling the transaction. And that's quite different, we think, from an independent third-party manufacturing firm. So your expert, Bernheim, says that you more than recruit the overcharge from the cartel by your prices to American customers. Yes. Doesn't that mean the American customers are the people who should be suing along with the Justice Department? The Supreme Court said no in Illinois BRIC, of course. And that is, what the Supreme Court said is... But you're not exactly fond of Illinois BRIC. Your Honor, I'm extremely fond of Illinois BRIC. Illinois BRIC teaches that we want to localize the claim in the furthest claimant upstream that we can so that we can centralize it here. And so, according to the Department of Justice, that would be the first domestic purchaser. That's us. And in any event, Illinois BRIC teaches us a second thing. And that is, when you do have... And this goes, Your Honor, to your... Well, what is the first domestic purchaser? The first domestic purchaser is Motorola Mobility. But you purchased abroad. Your Honor, that's what happens in import commerce. A domestic company will purchase from a foreign company. And what the FTA... The first American victim is the American consumer. We disagree. And that is... You didn't lose any. Your Honor, you're just, in my opinion, respectfully arguing against Illinois BRIC. Illinois BRIC says even if there is a full pass-on, you still regard the upstream American company as the first victim. It has the right to sue. The fact that there's 100% or 125% pass-through doesn't change that fact. But the upstream... But Motorola is purchasing abroad. Your Honor, as I said, every U.S. importer purchases abroad. There's a U.S. company here, Motorola Mobility. If it's an importer, it's going to have to buy from somebody else abroad. What the FTAIA says is there... But it's not buying from the cartel. It's buying from companies that have their own right of action against the cartel. That is correct. But that will be true in many import transactions. What the FTAIA asks is this. Look, there is a direct effect. We think the effect is that Motorola Mobility paid more. What the statute asks is that did that effect... Was it a direct, substantially, reasonably foreseeable effect? Is it direct if it is reasonably proximate? And it is reasonably proximate here because they dealt directly with the importer. Now, did it give rise... This court, when it first considered this case, saw two problems with their argument. One is directness. And the second is, does it give rise to a claim? And the court thought... And this really goes to Your Honor's point about, look, are we trying to have it both ways? And that is, can the parent corporation state a claim against... When it is the subsidiary that made the purchase. And the second part of Illinois BRIC that is very important, we think, is Illinois BRIC says quite expressly, if you have a parent corporation that directs a subsidiary's purchases, that doesn't fall within Illinois BRIC. And the Supreme Court had to have contemplated that such a claim could be brought. And that is the purchase by the subsidiary and the parent corporation would bring the claim. And the fundamental point here that I want to return to that I didn't finish off before is, would it make a difference to Congress in enforcing the antitrust laws, which are intended to protect U.S. consumers, that Motorola used a subsidiary versus making the purchase directly? How is the American consumer protected when you raise prices by more than the increase in the cost of the component? The Illinois BRIC teaches that the American consumer is protected because of the greater prospect of private enforcement of the antitrust laws. The protection comes from the fact that defendants will know, would-be cartelists will know, that they cannot get away with it. Well, on the contrary, Motorola seems to have done well out of this. It seems to have been delighted to pay the higher charge because it could pass it on to the American consumer with a little bonus for Motorola. That is not our perspective on it, Your Honor. If we had known that we were paying a cartel price, we would have refused. What the Supreme Court says... But there is no actual harm to Motorola. Your Honor, this is an objection that is brought in almost every case in which Illinois BRIC is at issue. And that is, it is settled in every court, including this one, that 100% or 125% pass-through is not an obstacle to bringing a claim. And the reason is, it is the greater prospect that the defendants, the cartelists, will be sued that deters the cartel in the first place. And that should be a grave concern to this Court. But you see, Motorola does not incur any cost when it overpays the cartelists. That is just a foreign transaction. It buys this stuff. It is expensive. The only harm in the United States occurs when it turns around and sells to consumers. That is correct. So you think they would be the people to sue? The Supreme Court says no. The Supreme Court says we do not want to leave it to consumer class actions. But those are domestic purchasers. Motorola is a domestic purchaser, sir. It is a purchaser in the United States in import commerce. And I think it's common ground that if Motorola owned the subsidiaries, that is to say, say that the subsidiaries didn't exist, it was Motorola's factories abroad. But isn't there a danger of form shopping? Because you could have just told your foreign subsidiaries to sue under local antitrust law. But instead you decided, you know, you like our antitrust laws more. Two points. But for tax purposes, of course, you prefer foreign taxation to domestic taxation. As I said, the tax consequences I don't think are any different because it is a subsidiary. No, they are different. Because they pay taxes under rates set by these foreign countries. Your Honor, my point is that if these factories existed in these foreign countries, Motorola wouldn't avoid local taxation as a consequence of them. It will always be the case in an international antitrust case, every single one of them, because the seller is abroad, that you could use foreign remedies. The Supreme Court explained in Alcoa that the question is instead, as a matter of prescriptive comedy, is there an intended substantial effect in the United States? Would Congress give up on the prospect of protecting consumers because there is an available foreign remedy? I'm pleased to answer further questions, but if I can reserve the remainder of my time. That's fine. Thank you, Mr. Goldstein. Mr. Frederick? Good morning, Your Honors. May it please the Court. I'm James Frederick on behalf of the United States. I want to thank the Court for the opportunity to be here. This is obviously a case of considerable importance to the United States, primarily because of the potential effect on our own enforcement efforts vis-à-vis the Sherman Act. Components are often made outside the United States. You know, I thought in our first round that the government was aligned with Motorola, but your brief isn't friendly to Motorola. You seem to be on a completely different track. I think the brief is sort of neither side. Certainly, I think the defendants take issue with our view of directness, but our view is that it is a direct effect. Your view is what? I'm sorry. I'm sorry. The price-fixing conduct on the components can have a direct effect on products containing those components that are sold in U.S. commerce, either import or domestic. And how would we limit the chain of impact? In other words, you're saying, you know, How would we limit the chain of impact? I think the court's test in MNKEM, approximate causation, is the tool we should use. And the Lotus decision in the Second Circuit provides some vocabulary how to make that assessment. One of the things it focuses on is whether there's a natural and probable chain of events. Approximate cause does allow intermediate steps. It doesn't require that the conduct be the nearest cause or the only cause. No, but look, given the ubiquity of some components in myriad products, would there be a limit as to what component incorporating products could be used to demonstrate this direct, foreseeable, and substantial effect that you are touting? Sure. We have investigated conspiracies to fix the price of components in wholly foreign commerce. And we've concluded that the evidence wouldn't support any effect. We think in a lot of cases, intermediate products aren't going to have these kind of effects. They'll be insubstantial. Aren't going to have. I'm so sorry. I'm sorry. The component price-fixing is not going to have any effect. It's not going to have a substantial effect. So in many cases, there won't be an effect at all. But the natural consequence of raising the price of a component is, in many industries, not all, but in many markets, in real-world facts, is that that price increase is going to increase the price of the products in U.S. commerce. In real-world facts, what about this case? The parties know the record better than we do, but I can speak with more experience on our own LCD case that we tried involving LCD panels that went into computer monitors and desktops. We tried that case in California. And the witnesses were able to say, yes, if you raise the price of this, it will directly impact the price of the monitors sold in the United States. So it's really a fact question. I understand why you want to bring these suits. These are injunctive or criminal suits. But I don't see in your brief anything about whether you think Motorola should be allowed to bring this suit. Which is so strange. I mean, it's surprising because, as I said, my impression was you were their booster. But you say all sorts of things. You say rather negative things about them, about what they're not entitled to. Well, I can elaborate. What is your view of this case? Well, our view... When you file an amicus curiae brief, it's usually to say something about this case rather than your rights to bring your own cases. Well, we are saying something about what direct means. I mean, look what you said on page 10. Permitting Motorola to recover on all its claims because it purchased some panels in import commerce would allow recovery for independently caused foreign injuries on the basis of happenstance. That's right. That's very negative. Yes, it is very negative. So you know what? You're not on Motorola's side anymore. No, you have to sit there. When you sit down, you have to go over there. The clerk's office directed us to sit on that side, for the record. That's right. The import exclusion doesn't apply merely because Category 1 in this case does apply. They can't recover treble damages for Category 2 under that exclusion merely because... No, I understand. Your concern is with direct. And you don't want direct interpreted narrowly. You want direct interpreted broadly enough so that you can bring your suits. But you're not conceding to Motorola that it has a right to bring the damages. The problem for Motorola is the second prong of the effects exception. Its subsidiaries suffered a foreign injury that is not the proximate result or not proximately caused by the effect in the United States. It's much like what the Second Circuit said in Lotus. It runs in the wrong direction. The harder question, which we haven't taken a position on, and maybe this is what's driving this questioning, is whether Motorola Mobility, the parent company, is the first purchaser in effect at U.S. Commerce, the way Mr. Goldstein described it as the first domestic purchaser. I think that's probably mistaken. Our view is the first purchaser in effect at U.S. Commerce could be an importer, it could be a foreign flag company, would be able to bring the case. In this situation, and the reason the government thinks that's important is because the travel damages remedy is important. It's an important supplement to our own enforcement efforts. So somebody should have it. And the person that is affected by those higher prices in cell phones should, their claim does arise from that effect. And the hard thing here is because of the relationship between the foreign subsidiaries and the U.S. parent from Motorola, is how does that relate? Do they count as the first purchaser because they're buying from their subsidiaries? We haven't taken a position on that. We don't really understand the facts very well on this record. And it's not critical to us whether it's Motorola that can bring that case or Motorola's customers. But we do think there's a root for the travel damages remedy. But in any event, if no one can bring a damages case, it's all the more important for the government to bring one. Let me answer just one other question. Sure, Your Honor. I was surprised by the fact that we've now heard from a number of foreign countries, all of whom are friends of the United States, that they're concerned about this litigation. And you don't mention any of those. Now, I realize the amicus brief, I think, of Japan was filed after your brief, but, you know, before the oral argument. And I wondered if you had any view about the feelings, if you can call it that, of these foreign countries that this kind of lawsuit is interfering with their own. I mean, what they argue is they do have antitrust laws and they provide antitrust remedies for these foreign subsidiaries, which are citizens of these foreign countries. And they don't like the idea that their antitrust remedies are going to be preempted, according to Motorola, by American antitrust law. Do you have any notion? I know you have State Department and Commerce Department officials on your brief. Is there any government view as to whether this kind of concern should be given any weight? I appreciate the opportunity to answer that question, and I want to do that. It's broad, so please, if you would let me have a few minutes, I would appreciate that. You sure you really appreciate the opportunity? It depends if there's follow-ups. The United States confers with them. We did address some of the amicus briefs that were filed at the rehearing stage in our supplemental brief. Our sense is that the foreign governments don't really have a beef with the United States enforcing the laws here. I mean, if you look at what the Belgian Competition Authority said in its brief, what the Japanese METI organization said, they don't seem to think it's inappropriate for the United States to. What I think troubles them is when you have more of an epigram-type situation, where you have foreign harm, a foreign plaintiff, which is what I would consider Motorola's subsidiaries, harmed abroad, and that harm is not dependent on the U.S. effect. And allowing that to be redressed in the U.S. court is what could create friction, because it's not redressing the U.S. harm. An affected purchaser in the United States, or the purchaser in commerce affected, when the United States brings an action because of that effect, that doesn't seem to bother them so much. When a purchaser affected in the United States brings a case, that doesn't seem to bother them so much. And the Belgian Competition Authority talks about Belgian purchasers should be able to proceed under Belgian law. So it's not the idea of extraterritorial application of the Sherman Act, per se, that is the problem. Most jurisdictions, well, many jurisdictions, the major jurisdictions in terms of size of economy, recognize the effects doctrine. And whenever you're going to have extraterritorial application of law based on effects, there's a risk of interference. But that risk is justified when it's intended to redress a domestic injury. And when the government brings an action, we are focused on the effects of the United States, and we're redressing those injuries, even if those effects derive ultimately from foreign conduct. And the same, I think, can be said about a first purchaser in U.S. commerce. Motorola subsidiaries, on the other hand, are much like the plaintiffs in the Supreme Court's Epigram case. They're folks that purchased in wholly foreign transactions whose harm does not depend on the effect in the United States. If anything, the effect on the United States depends on the harm to those persons. So in our view, the holding we're asking this court to make, which is that the effect can be direct, depending on the facts, between the foreign price fixing components and the commerce in products containing those components can be direct. We don't think that is going to disturb international relations, the United States' international relations. But a rule, a containment rule, any time a product contains the component, anybody can sue. That doesn't make sense. That's turning the United States into the world cop. Okay. Well, thank you very much, Mr. Fredericks. Mr. Wick. May it please the Court, I'm Robert Wick for the defendants. Motorola's foreign subsidiaries purchased panels that were made in foreign countries, delivered in foreign countries, paid for in foreign countries using funds maintained overseas, purchased pursuant to foreign-issued purchase orders which incorporated not U.S. law, the purchase orders incorporated foreign law, and the panels were then used at foreign factories. On those undisputed facts, the district court correctly held that Motorola cannot meet the gives rise to requirement of the domestic injury exception to the FTAIA. Four federal appeals courts have construed gives rise to. All four have said that gives rise to refers to the proximate cause of the plaintiff's injury. So if effects on U.S. commerce are what proximately injure the plaintiff, the plaintiff satisfies the gives rise to requirement. If effects on foreign commerce are what proximately cause the injury, the plaintiff doesn't satisfy the requirement. And here it was effects on foreign commerce that gave rise to the alleged injuries to Motorola. Motorola asserts two forms of injury, panel injuries and cell phone injuries. As to the panel overcharges paid by the foreign subsidiaries will rest on our brief and on Mr. Frederick's statement in his brief that the foreign subsidiaries don't have claims. They can't meet gives rise to. Motorola focuses its argument today on an internal purchase transaction. It alleges that there is an internal cell phone purchase transaction between the U.S. parent company and the foreign subsidiary that makes phones and that an increase in this internal transaction price is the source of its injury and the source of its claim. The first problem with that argument is that it was waived in the district court. That theory, that argument that an internal transaction, an elevation in an internal price between U.S. parent and foreign subsidiary was not raised in the courts below. If you carefully read all of the decisions by both courts below, the motion to dismiss decisions, the summary judgment decision, the motion for reconsideration decision, none of those decisions ever say word one about this internal purchase transaction theory because Motorola didn't raise it in any of its briefs, not in any coherent way. There are references here and there. Well, wait a minute. You may not think it's coherent when you say not in any coherent way. How was that? I'm not trying to be slippy by saying not in any coherent way. I don't think they raised it at all, and the district courts, I don't believe, think they raised it at all because none of the district court opinions discuss it at all. Well, we often see cases where district courts have missed issues. That's our raison d'etre. I can't see anything in those briefs. If you read the briefs and you ask yourself is anything in here putting the district court on fair notice that what Motorola is saying gives rise to its claim is an elevation in an internal transaction price, there's nothing in there that gives fair notice to either the defendants or the district court that that is Motorola's argument. And beyond that, Your Honor, Motorola expressly waived this cell phone purchase theory. In its answers to written discovery requests, Motorola said, and I quote, Motorola is not basing its claims on purchases of finished LCD products. It doesn't get any clearer than that. The term LCD products was defined to include cell phones that contain LCD panels. And the consequence of these waivers was to alter the course of the district court proceedings. In the district court, Motorola never produced the prices, the internal prices, that Mr. Goldstein relies on today. He says there was an elevation in that internal transaction price. If so, Motorola should have produced those transaction prices. Its experts should have quantified the increase in the internal transaction price. None of that ever happened. In fact, Your Honor, if you take- Well, isn't that in Bernheim's report? Which Bernheim report? There are two Bernheim reports, right? There's a Motorola Bernheim report, and then there's a Bernheim report in the Target and Sears case. And if you put those two expert reports side by side, they're almost verbatim identical, except the Sears and Target report has a chapter on effects on U.S. consumer prices of cell phones and televisions and computers. In the Motorola version of the Bernheim report, that chapter is ripped out. They purged it. So they made a deliberate decision to base their case on an increase in the panel price, not an alleged increase in the cell phone price. It wasn't an accident. It was a deliberate decision, which you can see from the expert reports. Now, are there references to cell phone effects in the briefs in the court below? No, there are. But none of those references articulate an internal transaction purchase theory. Those references are there for other reasons. They argue, among other things, balance sheet effects, that in the end this all rolls up to the corporate parent's balance sheet. They argue about whether there was a direct effect on the United States. They do not argue an internal transaction was the source of their injury or the source of their claim. On the merits, this internal transaction theory fails as well. As far as we have been able to determine, there is no case in which a court has ever said that an internal transaction between a parent and a subsidiary gives rise to a Sherman Act claim, that it gives rise to antitrust injury. According to Motorola, the internal transaction price was not set in competition. It was dictated by the U.S. parent company to the foreign subsidiary. And Motorola's own brief says... Was it negotiated or was it dictated? Their brief uses the word dictated. And, Your Honor, the key point in their brief is they say that market forces and competitive forces have nothing to do with that internal price. It's just an instruction from the parent to the subsidiary. And if market forces and competitive pressures have nothing to do with that price, that is not a competitive transaction that the Sherman Act regulates or cares about. We can't find any cases in which a court has said that an internal transaction can give rise to a Sherman Act claim. There's no antitrust injury when the transaction takes place outside the realm of competition. But if a component price increases, there's going to be some downstream consequence, isn't there? There may be. But the internal price is not a market price. If Motorola chooses, it can absorb that price increase at the level of the foreign subsidiary. It doesn't have to pass that price on. It's a non-market price. And they never produced the internal transaction price. We don't have it. We don't know what it was because of their waivers. Now, Motorola will say that ownership or control is an exception to Illinois BRIC. But satisfying Illinois BRIC doesn't mean you automatically get a Sherman Act claim. It just means that you satisfy Illinois BRIC. They still have to show antitrust injury. And as far as we can tell, they can't have it on an internal transaction. What we think ownership or control does for them is it enables the U.S. parent company to have standing, to stand in the shoes of the foreign subsidiaries and assert the foreign subsidiaries' panel overcharge claim subject to the same FTAIA bar that would apply if the foreign subsidiaries had sued on their own behalf. Let me ask you this. Do you agree with the government's position that conduct should be considered to involve import trade or commerce, even where the perpetrators themselves are not the importers? Your Honor, in a sense, yes. The question is whether the restraint of trade applies to import commerce. So the defendant does not have to be the physical importer in order to restrain trade in import commerce. If the defendants boycott imports, if they form an anti-competitive boycott of imports, they're not doing any physical importing, but they have restrained import commerce. And so that would meet the import commerce exclusion. More broadly, there are three key points on the import commerce exclusion. The first is that the conduct covered by the import commerce exclusion must be narrower than conduct that has a direct effect on U.S. import commerce because conduct that has a direct effect on U.S. import commerce is already covered in the direct effects provisions of the domestic injury exception. So if you accept Motorola's argument that just having foreseeability or just having a direct effect on import commerce triggers the import commerce exclusion, you have mooted a good chunk of the domestic injury exception. It would have the provisions in that section that talk about direct effects on U.S. import commerce would have no work to do. They wouldn't reach anything that wasn't already reached by the import commerce exclusion. Secondly, in MNCM, this court set out to define the type of commerce that is covered by the import commerce exclusion, and the definition the court supplied was pure import commerce, what the court alternatively described as simple import transactions between a foreign seller and a U.S. buyer. We don't have that here. As to these Category 2 and 3 claims at issue in this case, we have wholly foreign commerce. We have a foreign company making a panel and selling it to another foreign company in a foreign market. So the restraint of trade there is on wholly foreign commerce, and the question is not whether the import commerce exclusion is satisfied, but whether there is a direct effect on U.S. commerce that gives rise to the claim. And a direct effect on U.S. commerce does not give rise to Motorola's claim. The harm that Motorola is suing over is foreign harm, harm that flows from effects on foreign economies. And we don't use U.S. antitrust law to police harm that flows from effects on foreign economies. We use U.S. antitrust law only to police harm that flows from effects on the U.S. economy. When we start using U.S. antitrust law to police foreign economies, that's when we get foreign governments up in arms. That's why we have Belgium. Let me see if I understand what you're saying. So you're saying that all Motorola is complaining about, in the district court, was that because the foreign subsidiaries were being manipulated by a cartel, the price at which the foreign subsidiaries sold the LCD panels to Motorola or other Motorola subsidiaries, that was a higher price? That's what I heard Mr. Goldstein saying. So price fixed price. But you're saying that they didn't take the next step, which was to say that the inevitable consequence was that Motorola was going to be hurt because it would have to increase the price of its cell phones. Is that the next step? What we're saying is that Motorola... Because if it just swallowed, it just said, all right, we have to pay more for these LCDs, we're dealing with cartelists, so we'll pay more, it's not a big deal, 10% or something, 10% component, so we'll just pay it. So is your notion that that would not state any U.S. cause of action? Certainly, if the only harm was to the foreign subsidiary, there would be no U.S. cause of action. We're saying two things. First... Well, the harm to the foreign subsidiary is going to be a harm to Motorola. Well, it's a derivative harm. The derivative injury would bar Motorola from suing over some sort of balance sheet effect. A harm is a harm. Right, but under settled Seventh Circuit precedent, shareholders are harmed when a corporation they own loses money, but we don't let shareholders sue when the corporation can sue. Here, Motorola is a shareholder of its corporations. Our point, and I see my red light is on, so I'll wrap this up. Our point is that the harm to the foreign subsidiaries is a foreign harm. Any sort of balance sheet derivative injury to the corporation is barred under the derivative injury rule. If they're trying to get past the derivative injury rule by saying that prices they dictated to their own subsidiaries injured them, they can't say that prices they dictated, prices they set between foreign subsidiary and U.S. parent harmed them. And if they sold at higher prices in the U.S., that's not a harm to them. That's a benefit to them if they have higher selling prices in cell phones. Well, unless their sales drop. Which they expressly waive that claim. The lost sales claim would be a quite different claim as far as the analysis, but they expressly waive that. So it may be that their U.S. customers have a claim, but Motorola doesn't have a claim. Thank you very much. Okay. Thank you, Mr. Wicks. Mr. Goldstein? Thank you, Your Honors. I'd like to make three points. The first is we think the other side now is trying to have it both ways. They insist that you look at these transactions as occurring through two different companies, that the subsidiaries are independent of Motorola, but they refuse to recognize the injury that occurred to Motorola. Now, in this case, it is common ground that 100% But, of course, what Mr. Wicks said last, which was interesting, was that really Motorola is just a stockholder. The foreign subsidiaries get clubbed by the cartel, and Motorola, as the owner of the foreign subsidiaries, is hurt. That's what he called a balance sheet. It is not a balance sheet injury. Well, but Motorola is the owner. Sure. And the Supreme Court said that there will be these cases. But owners usually don't get to sue for the damage to their corporations. And the most important part of that sentence, we think, is usually. The Supreme Court made quite clear that there will be these cases where you have control,  This is a case where it's agreed that Motorola absorbed and then passed through. But it did take on 100% of the overcharge. The limiting principle, Your Honor, is incredibly important. And we recognize that the limiting principle here that separates this from all the other cases is that they were working directly with the importer. They negotiated these prices with the U.S. entity. They set the prices with them. They designed the products with us. And we want to prove at summary judgment that this is reasonably proximate because the injury to the U.S. import commerce came from their conduct with us, the importer. Okay. Well, thank you very much, Mr. Goldstein. And thank you, Mr. Fredericks and Mr. Wick. And I'm going to take the case under advisement.